MICHAEL P. LEHMANN (State Bar No. 77152)
BONNY E. SWEENEY (State Bar No. 176174)
CHRISTOPHER L. LEBSOCK (State Bar No. 184546)
HAUSFELD LLP
44 Montgomery St., Suite 3400
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:   (415) 217-6813
mlehmann@hausfeldllp.com
bsweeney@hausfeldllp.com
clebsock@hausfeldllp.com

*Counsel for Plaintiffs*

[Other counsel for Plaintiffs are listed
on the signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN MACHIKAWA,  BERNADETTE GOODFELLOW, and GEORGINA LEPE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs<br><br>                    v.<br><br>COOPER VISION, INC.; ALCON LABORATORIES, INC.; BAUSCH + LOMB; JOHNSON & JOHNSON VISION CARE, INC.; and ABB OPTICAL GROUP, Defendants | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE SHERMAN AND CLAYTON ACTS AND STATE LAWS**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## I.      INTRODUCTION.

1.      Plaintiffs John Machikawa, Bernadette Goodfellow, and Georgina Lepe ("Plaintiffs") bring this action under federal and state antitrust laws on behalf of themselves individually and on behalf of a Plaintiff class (the "Class") consisting of all persons and entities in the United States who purchased disposable contact lenses ("contact lenses") manufactured by Defendants Alcon Laboratories, Inc. ("Alcon") (a division of Novartis International AG ("Novartis"); Johnson & Johnson Vision Care, Inc. ("J&J") (which operates in the United States under the "Vistakon" trade name); Bausch + Lomb ("B&L") owned by Valeant Pharmaceuticals, Inc. ("Valeant"); and Cooper Vision, Inc. ("CV") (collectively "Manufacturer Defendants") subject to one of the so-called "Unilateral Pricing Policies" ("UPPs") described herein from June 1, 2013 to the present. Except with respect to the allegations relating to themselves, all of Plaintiffs' allegations herein are based on information or belief.

2.      Plaintiffs assert that the Manufacturer Defendants conspired with each other and with Defendant ABB Optical Group ("ABB"), a wholesaler, as well as independent eye care professionals ("ECPs") represented by ABB (*e.g.*, optometrists and ophthalmologists who sell contact lenses to consumers) and their trade association, the American Optometric Association ("AOA"), to impose minimum resale prices on certain contact lens lines by subjecting them to so-called UPPs and thereby eliminate price competition on those products by "big box" stores (*e.g.*, those owned by Wal-Mart Stores, Inc. ("Wal-Mart") and Meijer, Inc. ("Meijer")), buying clubs (*e.g.*, those run by Costco Wholesale Corporation ("Costco")), and internet-based retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com) by substantially preventing them from discounting those products. As ECPs themselves have acknowledged, this new pricing scheme represents a "fundamental shift" in how contact lenses are sold to consumers.

3.      The Manufacturer Defendants, ABB and the ECPs all share an interest in increasing the retail price of contact lenses and limiting competition from big box stores, buying clubs and internet-based retailers.  The Manufacturer Defendants have also expressed concern about the deep discounts offered by online retailers, because they saw price-bargaining power

1  shifting away from manufacturers towards big buyers. These concerns were reportedly

2  exacerbated after Luxottica, the world's largest glasses and sunglasses manufacturer, agreed to

3  purchase 1-800 Contacts in 2014. ABB, which is the largest distributor of contact lenses in the

4  United States and which services more than two-thirds of ECPs, shares the Manufacturer

5  Defendants' goal of increasing retail prices. ECPs, which have traditionally sold contact lenses at

6  prices much higher than those offered by big box stores, buying clubs and internet-based retailers,

7  similarly sought to limit such price competition.

8      4. Competition in the market for contact lenses in the United States is distorted by the

9  unique role played by ECPs. Unlike prescription drugs, which are prescribed by doctors but sold

10  only by pharmacies, ECPs both prescribe and sell contact lenses. When an ECP writes a

11  prescription for a patient, that ECP prescribes not only the type and power of the lenses, but also

12  the particular brand. Unless the patient comes back for another eye exam, or switches ECPs, he or

13  she is locked into buying the prescribed brand of lenses for the length of the prescription, typically

14  from one to two years.

15      5. The power to prescribe makes ECPs the gatekeepers of the disposable contact lens

16  market. ECPs have the power and the economic incentive to prescribe lenses that provide them the

17  largest profit margins. Contact lens manufacturers understand these incentives all too well. ECPs

18  will refuse to prescribe a manufacturer's lenses if their profit margins are undercut by more

19  efficient retailers such as mail order and internet companies, or big box stores. As a result, contact

20  lens manufacturers have always done what they can to insulate ECPs from price competition. The

21  economic purpose of the UPPs is to insulate ECPs from price competition from more efficient

22  distributors.

23      6. Defendant ABB also plays an important role in the industry. As its website states,

24  "ABB OPTICAL GROUP is the nation's largest distributor of soft contact lenses. We supply more

25  than two-thirds of Eye Care Professionals in America with brand name contact lenses; high grade

26  ophthalmic and fully customizable Gas Permeable Lenses." ABB sells primarily to Independent

27  ECPs as opposed to ECPs employed by chain optical stores such as LensCrafter. Independent

28

ECPs charge the highest average prices for contact lenses compared to any other channel of distribution. ABB's unique role in the industry is buttressed by its simple-minded focus on raising ECPs' profit margins. Angel Alvarez ("Alvarez"), ABB's CEO, describes his company as the "category captain" for ECPs, and says ABB is "helping them manage that [contact lens] portion of their business. . . . .We take very seriously the trust that they have."  His stated goal is to help ECPs grow their practices and "make more money."  ABB is not merely a wholesale vendor. It regularly surveys its ECP customers to find out how much they are charging their patients for each different type and brand of contact lenses. ABB then publishes the results of the surveys in its periodic *Retail Price Matrix* publication so that ECPs can make sure their prices are as high as their fellow practitioners. In its *Profit Advisor* newsletter, ABB also advises its ECP customers to charge as much as possible for contact lenses, beyond the UPP floor set by the Manufacturer Defendants. As the biggest customer of the manufacturer defendants, ABB acts as an agent for its 19,000 Independent ECP customers. UPPs benefit ABB by forcing more consumers to purchase replacement contact lenses from the Independent ECPs who are ABB's customers.

7.     To accomplish their shared goals, the Manufacturer Defendants, ABB and the Independent ECPs jointly agreed to alter the pricing model.  Before June of 2013, each of the Manufacturer Defendants permitted distributors and retailers to determine the prices at which they would sell their contact lenses and did not preclude discounting of such products.  Now, each of the Manufacturer Defendants prohibits retailers from selling certain lines of contact lenses below mandated prices.  This draconian change in the pricing model would not have occurred in the absence of a conspiracy among the Defendants. Contact lenses are the *only* prescription medical device sold in the United States pursuant to a UPP.

8.     As part of this conspiracy, ABB worked with the Manufacturer Defendants to develop UPPs for several of the most advanced and most popular lines of contact lenses sold by the Manufacturer Defendants.  Over the course of 15 months commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of minimum resale price maintenance ("MRPM") scheme that it called a "UPP."   Under this MRPM scheme, each

Manufacturer Defendant promulgated a minimum retail price for its affected product(s) and threatened to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price. Alcon was the first to do so in June of 2013 and expanded the number of contact lenses subject to the policy to four lines in succeeding months. B&L followed suit with respect to one of its major contact lens product lines in February of 2014. J&J took a similar step with respect to at least eight of its contact lens product lines in June of 2014. And CV followed suit in September of 2014 with respect to one of its contact lens lines.

9. In testimony given at a hearing held on July 30, 2014 before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the United States Senate's Judiciary Committee investigating the practices at issue here ("Senate Hearing"), it was estimated that the MRPM agreements implemented by Alcon, J&J and B&L encompassed 40% of the domestic contact lens market and that the Manufacturer Defendants would extend their UPPs to cover 80% of the market by the end of 2015.

10. Despite the name given to the MRPM agreements by the Manufacturer Defendants, and contrary to statements by the Manufacturer Defendants' executives, those agreements are not "unilateral" pricing policies. Instead, the Manufacturer Defendants agreed to limit retail price competition only after extensive consultation with Independent ECPs and their agent, the ABB. Following implementation, the Manufacturer Defendantshave enforced the MRPM agreements through actual retaliation, as well as threats, warnings and other communications that ensure compliance with the agreements.

11. The MRPM agreements were intended to eliminate discounting by big box, internet and warehouse club store retailers of contact lenses, thereby decreasing their ability to compete with Independent ECPs who also sell contact lenses. The MRPM agreements have had the desired effect, as reflected in statements by Independent ECPs, ABB, and big box, warehouse club and internet retailers.

12. Thus, for example, Jim Murphy ("Murphy"), Vice-President of Alcon, described Alcon's MRPM agreements in a public podcast as, *inter alia*, "a win" for the manufacturers and

the doctors. Independent ECPs have enthusiastically endorsed the MRPM agreements. As Gary Gerber ("Gerber"), one influential Independent ECP put it; the agreements guarantee doctors "a margin they have not seen for 20 years." Likewise, ABB has also touted the MRPM agreements; its CEO, Angel Alvarez ("Alvarez"), called them one of the best developments of the last 20 years, because they help ECPs raise profit margins.

13. The MRPM agreements (and the reference to their accomplishing the highest margins for ECPs in 20 years) have to be viewed in the context of successful prior industry efforts to suppress price competition for contact lenses. More than two decades ago, contact lens manufacturers conspired with ECPs to restrict the supply of contact lenses to alternative sources of distribution (*e.g.*, mail-order houses). In 1996, 32 state attorneys general ("AGs") and consumers brought antitrust lawsuits against J&J, B&L, CIBA Vision ("CIBA") (Alcon's predecessor), and the AOA to curtail these practices. The cases eventually settled and the challenged practices were discontinued.

14. More recently, in 2009, the German Federal Cartel Office levied a fine of €11.5 million against CIBA for fixing minimum resale prices of contact lenses and restricting internet and wholesale prices of its contact lenses. CIBA was found to have utilized an internal "price maintenance" program whereby it enforced minimum resale prices for contact lens in violation of European Community and German law.

15. Last year, Manufacturer Defendants J&J and B&L were fined by China's National Development and Reform Commission ("NDRC") for violating China's Anti-Monopoly Law. In May of 2014, J&J was fined 3.6 million Yuan and B&L was fined 3.7 million Yuan for adopting UPPs and requiring retailers to adhere to MRPM agreements, among other practices.

16. MRPM policies represent merely the latest effort by the Manufacturer Defendants and independent ECPs to ensure that discounting of contact lenses does not occur. The victims, as in 1996, are the tens of millions of consumers who use contact lenses.

17. The MRPM practices of the Defendants constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1) and state antitrust and unfair

competition laws.

18. Defendants' conspiracy has caused plaintiffs and class members to pay millions of dollars more for contact lenses than they otherwise would have paid.

## II. JURISDICTION AND VENUE.

19. Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and of the antitrust laws of California and Maryland.

20. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

21. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## III. INTRADISTRICT ASSIGNMENT.

22. Intradistrict assignment to the San Francisco Division is appropriate. The practices at issue affect adversely contact lens customers who reside in that division. On March 2, 2015, Costco filed a related case against J&J concerning its use of MRPM agreements with respect to contact lenses. *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-00941 (N.D. Cal.) ("*Costco* Action").

## IV. PARTIES.

### A. <u>Plaintiffs</u>

23. Plaintiff John Machikawa is a resident of the State of California and has purchased during the Class Period defined herein contact lenses manufactured by one of the Manufacturer Defendants that were subject to UPPs.

24. Plaintiff Bernadette Goodfellow is a resident of the State of Maryland and has purchased during the Class Period defined herein contact lenses manufactured by one of the Manufacturer Defendants that were subject to UPPs.

25.   Plaintiff Georgina Lepe is a resident of the State of California and has purchased during the Class Period defined herein contact lenses manufactured by one of the Manufacturer Defendants that were subject to UPPs.

**B.   Defendants**

26.   Defendant Alcon is a United States company headquartered in Fort Worth, Texas that is owned by Novartis. Alcon makes eye care products, including contact lenses.

27.   Defendant J&J is a United States company headquartered in Jacksonville, Florida. J&J makes eye care products, including contact lenses.

28.   Defendant B&L is a United States company founded in Rochester, New York and now headquartered in Bridgewater, New Jersey; it is now owned by Valeant. B&L makes eye care products, including contact lenses.

29.   Defendant CV is a United States company headquartered in Pleasanton, California. CV makes eye care products, including contact lenses.

30.   Defendant ABB is a United States company headquartered in Coral Springs, Florida that has its contact lens manufacturing operation and one of its distribution centers in Alameda, California. ABB states on its website that it "is the nation's largest distributor of soft contact lenses," and that it "suppl[ies] more than two-thirds of [ECPs] in America with brand name contact lenses, high grade ophthalmic and fully customizable Gas Permeable Lenses." ABB wholesales the contact lenses sold by the Manufacturer Defendants and services over 19, 000 ECPs nationwide.

31.   Various persons that are not named as Defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date. There is a finite number of co-conspirators and Plaintiffs believe that their identities can be ascertained through Defendants' own records,

**V.   CLASS ACTION ALLEGATIONS.**

32.   Plaintiffs bring this action both on behalf of themselves, and as a class action

pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on behalf of the following class (the "Class").

> All persons and entities who purchased disposable contact lenses manufactured by Alcon, J&J, B&L, or CV from June 1, 2013 to the present (the "Class Period"), where the prices for such contact lenses were set pursuant to a "Unilateral Pricing Policy" as described herein.  Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

33.     The Class includes subclasses of persons located in California and Maryland who purchased disposable contact lenses subject to UPPs. These will be referred to herein, respectively, as the "California subclass" and the "Maryland subclass." The named Plaintiffs who represent the California subclass will be referred to herein as the "California Plaintiff" and the named Plaintiff who represents the Maryland subclass will be referred to herein as the "Maryland Plaintiff."

34.     Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants.  Plaintiffs believe that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States such that joinder of all class members is impracticable.

35.     Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs all purchased contact lenses subject to a Manufacturer Defendant's MRPM agreement. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

36.     Numerous questions of law or fact arise from Defendants' anticompetitive conduct that is common to the Class, including but not limited to:

> a.     Whether the Manufacturer Defendants engaged in a contract, combination, and/or conspiracy among themselves and with ABB and the ECPs to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

> b.     Whether the Manufacturer Defendants' MRPM agreements operated as unreasonable restraints of trade;

1           c.     Whether Defendants' conduct caused the prices of contact lenses sold in the

2   United States to be sold at artificially high and supra-competitive levels;

3           d.     Whether Plaintiffs and the other members of the Class were injured by

4   Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class

5   members; and

6           e.     The scope of any injunctive relief to which Plaintiffs and the other members

7   of the Class are entitled.

8       37.     These and other questions of law and fact are common to the Class and

9   predominate over any questions affecting only individual Class members.

10      38.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased

11  contact lenses covered by one or more of the Defendants' UPPs.

12      39.     Plaintiffs will fairly and adequately represent the interests of the Class in that they

13  have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained

14  competent counsel experienced in antitrust, class action, and other complex litigation.

15      40.     Defendants have acted on grounds generally applicable to the Class, thereby

16  making final injunctive relief appropriate with respect to the Class as a whole.

17      41.     This class action is superior to the alternatives, if any, for the fair and efficient

18  adjudication of this controversy. Prosecution as a class action will eliminate the possibility of

19  repetitive litigation. There will be no material difficulty in the management of this action as a

20  class action. Prior class action litigation involving similar conduct with respect to a similar

21  consumer class and the same products was successfully managed through trial in the case of *In*

22  *re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.) ("First Contact Lens

23  Litigation").

24      42.     The prosecution of separate actions by individual Class members would create the

25  risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

26  Defendants.

27

28

---

CLASS ACTION COMPLAINT         - 9 -         Case No.

## VI.     TRADE AND COMMERCE.

43.     Based on evidence given at the Senate Hearing, nearly 39 million Americans wear contact lenses, spending approximately $4.2 billion annually on these products.

44.     During the Class Period, each Manufacturer Defendant (or one or more of its subsidiaries) and ABB sold contact lenses in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

45.     During the Class Period, the Manufacturer Defendants collectively controlled a majority of the United States contact lens market.

46.     Defendant ABB is the largest distributor of contact lenses in the United States. More than two-thirds of ECPs in the United States purchase contact lenses from ABB.

47.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.    FACTUAL ALLEGATIONS.

### A.      <u>The Disposable Contact Lens Market.</u>

#### *1.     The Nature of the Products And The Market In Which They Are Sold.*

48.     For purposes of this complaint, the term "contact lenses" refers to disposable contact lenses. Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States. Depending on the contact lens line, these contact lenses are replaced either on a daily, weekly, or monthly basis: daily contact lenses are designed to be worn for a single day; weekly contact lenses are designed to be replaced on a weekly basis; and monthly contact lenses are designed to be replaced every one to three months. Contact lenses include both spherical lenses, which contain a single refractive power, and specialty lenses, which are crafted to address specific vision conditions such as toric lenses (for people diagnosed with astigmatism), and bifocal and multifocal contact lenses (for people diagnosed with presbyopia). As Murphy of Alcon admitted in the podcast referenced above, contact lenses are a commoditized product.

49.     The United States Food and Drug Administration ("FDA") first approved soft contact lenses in 1971. Disposable contact lenses are a soft contact lens. Since that time, contact lenses have been treated as Class II and Class III pharmaceutical devices that require a prescription from an ECP to purchase. The first generation of contact lenses required significant work on the part of an ECP to fit the lens, and as a result, most consumers purchased their contact lenses directly from their ECP. However, as contact lens technology improved, consumers were able to unbundle the purchase of their lenses from their eye exams because, in the words of a 2005 report by the Federal Trade Commission ("FTC") entitled *The Strength of Competition In The Sale of Rx Contact Lenses: An FTC Study* (the "2005 FTC Report"), "the replacement lens a consumer purchases pursuant to a prescription that specifies a brand will be identical, regardless of where it is purchased." However, to make it more difficult for patients to shop for replacement lenses, ECPs often refused to hand over a copy of their patient's prescription.

50.     That situation changed with the December 6, 2003 enactment of the Fairness to Contact Lens Consumers Act ("FCLCA") (15 U.S.C. §§ 7601 *et seq*.), which requires ECPs to provide patients copies of their contact lens prescriptions automatically so that they can purchase their contact lenses from a retailer other than their ECP. Section 4(f) of the FCLCA (15 U.S.C. § 7603(f)) also barred sellers from altering a contact lens prescription. The legislative history of the FCLCA made it clear that the legislation was intended to "promote[] competition, consumer choice, *and lower prices* by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice." (Emphases added).

51.     In 2004, the FTC issued the Contact Lens Rule (16 C.F.R. Parts 315 and 456), which spells out the FCLCA's requirements.  That rule reaffirms that ECPs must give a copy of the contact lens prescription to the patient at the end of every contact lens fitting – even if the patient does not request it.  It contains other requirements that are intended to make it easier for the patient to take his or her prescription to an alternative source in order to reap the benefits of competition.  As the FTC has stated, the FCLCA "increases consumers' ability to shop around

1    when buying contact lenses."

2              2.      *Market Concentration.*

3         52.      The Manufacturer Defendants are the four major contact lens manufacturers in the

4    United States.

5         53.      According to testimony given by R. Joe Zeidner ("Zeidner"), the former General

6    Counsel of 1-800-Contacts, at the Senate Hearing, the four Manufacturer Defendants collectively

7    control 97% of the United States contact lens market, J&J controls 35.3% of the market, Alcon

8    controls 30.6% of the market, B&L controls 7.2% of the market, and CV controls 23.9% of the

9    market. As discussed below, all have implemented MRPM agreements with respect to some of

10   their contact lens product lines.

11        54.      The contact lens manufacturing industry has grown even more concentrated in

12   recent years, as large pharmaceutical companies have acquired contact lens manufacturers.  For

13   example, in 2011, Novartis acquired Alcon, for roughly $12.9 billion.  Similarly, Valent entered

14   this industry through its $8.7 billion acquisition of B&L in August 2013.  And in August 2014,

15   CV acquired Sauflon Pharmaceuticals Limited.

16        55.      New entry is not likely to displace this concentration. Barriers to entry, including

17   manufacturing and development costs, as well as regulation by the FDA and states, are high. Apart

18   from the four Manufacturer Defendants, other manufacturers in this market are small and

19   specialize in niche products or contact lenses for specific eye disorders. Profits in the industry

20   have been estimated at 10.1%, with the Manufacturer Defendants enjoying the highest levels of

21   profitability.

22        56.      For purposes of the allegations of this Complaint, the relevant product market is the

23   market for soft (disposable) contact lenses and the relevant geographic market is the United States,

24   given that contact lenses sold in this market are packaged specifically for such sales. This is the

25   market analyzed in the 2005 FTC Report and in its 2004 report entitled *Possible Anticompetitive*

26   *Barriers To E-Commerce: Contact Lenses* (the "2004 FTC Report").

27

28

3.      *Retail Channels.*

57.      Today, consumers with a prescription from an ECP can purchase their contact lenses from a variety of sources, including independent ECPs, national optical chains (*e.g.*, LensCrafters), mass merchandisers (*e.g.*, Wal-Mart and Target), wholesale clubs (*e.g.*, Costco), and online retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com).

58.      Cumulatively, thirty-five million Americans spend roughly $4.2 billion per year on contact lenses in these various retail channels.

59.      The 2005 FTC Report presents data from both Ocular Sciences, Inc. ("OSI") and 1-800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels. The OSI figures were as follows:

| Retailer Type | Share of Patient Visits | Estimated Share of Filled Prescriptions |
|---|---|---|
| Independent MD | 14.1% | 12.3% |
| Independent OD | 52.6% | 45.8% |
| Independent Stores and OD Groups | 12.2% | 10.6% |
| Chain Retailers and Optical Stores | 21.0% | 18.4% |
| Mail Order/Internet | n/a | 13.0% |

60.      The data presented by 1-800-Contacts were as follows:

| Channel | Estimated Share of Filled Prescriptions |
|---|---|
| Independent MD | 4.3% |
| Independent OD | 64.3% |
| Mass Merchandisers | 13.0% |
| Chain Retailers | 9.5% |
| Mail Order/Internet | 8.0% |

61.     The FTC concluded that both sets of data told the same story: "Manufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel."

62.     A more recent industry survey has estimated that retail chains' and mass merchandisers' share of contact lens sales will reach 20.5% on 2015, while online retailers' share will reach 9.2%.

### 4.     Pricing In Retail Channels.

63.     Multiple studies conducted prior to implementation of the MRPM agreements found that contact lenses were cheaper when purchased online or from big-box stores as opposed to independent ECPs.

64.     As noted in the 2004 FTC Report, a 1998 study found that the average price of a six-lens pack of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP instead of from one of the other categories of retailers.

65.     The 2004 FTC Report also presented a March 2004 study by 1-800-Contacts reflecting similar results, which are set forth below.

| | Contact Lens | | |
| --- | --- | --- | --- |
| Retailer | Focus Toric (CIBA) | FreshLook Colorblends (CIBA) | Acuvue 2 (J&J) |
| ECPs | | | |
| Optical Chains | $66.69 | $42.09 | $22.85 |
| Independent Optometrists | $70.91 | $46.67 | $24.39 |
| Ophthalmologists | $73.18 | $46.54 | $25.74 |
| **ECP Average** | **$70.26** | **$45.10** | **$24.33** |
| Non-ECPs | | | |
| Mass Merchandisers | $53.21 | $35.40 | $18.05 |
| 1-800-Contacts | $59.00 | $34.95 | $19.95 |
| **Non-ECP Average** | **$56.11** | **$35.18** | **$19.00** |

| | | | |
|---|---|---|---|
| *Price Difference* | *$14.16* | *$9.93* | *$5.33* |
| *% Difference* | *+25.2%* | *+28.2%* | *+28.0%* |

66.     In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both an online and offline presence) and from 14 offline retailers in Northern Virginia. It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers." The cumulative results of this study are set forth below.

| Channel | Average Price of All Lenses |
|---|---|
| Non-ECPs | |
| Pure Online Retailer | $87.77 |
| Hybrid Retailer | $106.38 |
| Wholesale Club | $83.18 |
| Mass Merchandiser | $108.38 |
| **Non-ECP Average** | **$96.43** |
| ECPs | |
| Optical Chain | $109.20 |
| Independent ECP | $112.35 |
| **ECP Average** | **$110.78** |
| | |
| *Price Difference* | *$14.34* |
| *% Difference* | *+14.9%* |

67.     Based in part on this study, the FTC concluded that the FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere had increased competition and reduced contact lens prices across the country.

68.     The significant price disparities between ECP pricing and mass merchandiser and

on-line retailers (and resulting savings for the consumer) continued until the Defendants imposed MRPM policies.

69.    In addition to the actual pricing differences that existed prior to the UPPs, purchasing contact lenses from a brick-and-mortar retailer also imposes a time cost that is not present in purchases from online retailers. In a 2002 study presented to the Connecticut Department of Public Health, the FTC calculated that an hour-long trip to a brick-and-mortar retailer had "an implicit time cost of between $10.96 and $26.00," which was "a markup of between 50 and 130 percent over the cost of a multipack."

70.    As stated in a July 2014 *Reuters* article, "'[t]he online channel is beginning to garner considerable attention from [ECPs]. Many are seeing this channel as a threat to traditional stores,' said Euromonitor. 'The pricing strategies on the Internet usually mean a much cheaper price than that found in physical stores.'"

**B.    Prior Efforts By Manufacturers And Independent ECPs To Reduce Price Competition For Contact Lenses.**

71.    Because of the price competition engendered by the mass merchandisers and internet retailers, ECPs and contact lens manufacturers have repeatedly attempted to limit their impact.  In 1996, in the First Contact Lens Litigation, consumers and 32 state AGs filed antitrust lawsuits against J&J, B&L, CIBA, and the AOA. *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996). These lawsuits alleged that the contact lens manufacturers and the AOA (the independent ECPs' trade association) "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution." Specifically, the plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (*e.g.*, mail order houses and pharmacies), and that but-for this conspiracy, the plaintiffs would have paid lower prices for contact lenses. *In re Disposable Contact Lens Antitrust Litig*., MDL No. 1030, 2001 WL 493244 (M.D. Fla. Feb. 8, 2001).

72.    In 2001, the district court denied the various defendants' motions for summary

judgment. *Id.* Employing both a *per se* analysis (and an alternative Rule of Reason analysis), the court evaluated whether "a reasonable fact finder could conclude from the evidence that the ECP community threatened to boycott any manufacturer who did not implement an ECP-only distribution policy and that [d]efendant manufacturers reached a tacit, if not express, agreement with the ECP community and each other to restrict sales to alternate channels." In concluding that the plaintiffs had "proffered ample evidence" to overcome the summary judgment motions, the district court pointed to the following pieces of evidence, among others:

- "A Vistakon [(now J&J)] memo discussing the agenda for the AOA/Vistakon meeting that took place January 15, 1992 stating, *inter alia,* 'reduc[ing] the possible trend away from prescribing Acuvue/Surevue as a result of patients'[*sic*] buying lenses from outlets other then [*sic*] their own practitioner.'"

- "A deposition excerpt wherein Vistakon's Consumer Products Director was asked why Vistakon changed its policy, stated 'We couldn't sell our products and doctors were saying to sales reps, 'I am losing patients; therefore, I don't want to put any more new patients in Acuvue because they will walk out of my door.''"

- "A memo written by Vistakon's D.R. Yadon, given to Vistakon sales personnel which is entitled 'Vistakon Gets Tough on Diverters,' discussing a 'joint effort between the manufacturers and professional organizations to address this [diversion] problem.'"

- "A Memo written by Craig Scott, Vistakon's Vice President for Marketing to Phillip Keefer discussing 'our action plan' regarding patient retention. . . . The stated objectives were to assist ECPs in retaining patients and to maintain ECPs' 'positive attitude toward fitting new patients with Vistakon products.' The two strategies listed to further those ends were to reduce the supply and the demand for diverted products. The memo went on to discuss, *inter alia,* disguising the prescription from the patient and also discussed obtaining AOA feedback on the aforementioned proposals."

73.    After the district court denied summary judgment, and following several weeks of trial, the parties settled. B&L paid $8 million into the settlement fund, offered a benefit package valued at $121 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis. J&J paid $25 million into the settlement fund, offered a benefit package valued

at $100 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis. AOA paid $750,000 into the settlement fund, agreed to not restrict where consumers could obtain their replacement contact lenses, and agreed not to oppose the release of contact lens prescriptions. AOA also agreed not to make claims that eye health was impacted by the retail channel from which the contact lens was purchased.

74.      While this settlement resolved the issues as to the discriminatory practices of J&J, B&L and Alcon's predecessor, other manufacturers continued to engage in these practices. On September 15, 2006, the Commerce, Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee held a hearing entitled *Contact Lens Sales: Is Market Regulation the Prescription?* Subsequently, the manufacturer most visibly engaged in restrictive distribution policies abandoned the practice, effectively making the need for the legislation moot.

75.      As explained above, two of the Manufacturer Defendants—J&J and B&L—were fined by the FCO in 2009 and China's competition authority in 2014 for mandating minimum retail prices in violation of, respectively, European Community and German law and  China's Anti-Monopoly Law.   According to the NDRC, the manufacturers used punitive measures, including fines and warnings, to ensure that retailers abided by the minimum price restraints.

76.      Independent ECPs and the ABB have engaged in other practices to limit retail price competition.  For example, before the Manufacturer Defendants implemented MRPM agreements, ABB not only facilitated the exchange of retail price information among ECPs, but also urged ECPs to adopt uniform pricing.  ABB publishes a quarterly pricing survey, called the Retail Price Monitor, which calculates average prices for the biggest-selling contact lens lines.  The survey relies on the prices of more than 450 practices.  The Retail Price Monitor "makes it easy" for ECPs to set contact lens prices and "maximize contact lens margins".   ABB also operates yourlens.com, which independent ECPs can use to order contact lenses online, and which provides suggested retail prices.  As stated in ABB's promotional materials, "Yourlens.com takes the guesswork out of setting your online prices by utilizing our Retail Price Monitor suggested prices."

C.   **Implementation of the MPRM Agreements Through "UPPs".**

1.   *Actions By Manufacturer Defendants.*

77.   Alcon was the first of the Manufacturer Defendants to announce a MRPM policy. Although Alcon initially announced an MRPM policy for a single product line, today, Alcon has RPM policies on four of its contact lens brands. In June of 2013, Alcon implemented its first MRPM policy for its DAILIES TOTAL1® contact lenses. In January of 2014, Alcon extended its policy to three other lines of contact lenses: DAILIES® AquaComfort Plus® Multifocal and DAILIES® AquaComfort Plus® Toric contact lenses. And in June of 2014, Alcon extended its RPM policy to AIR OPTIX® COLORS contact lenses. Alcon has sought the written consent of ECPs to its UPPs. According to one optometrist who wrote on "ODs on Facebook," an Alcon representative "made a special appointment with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy." Another ECP on the same website confirmed that this was Alcon's standard practice.

78.   In February of 2014, B&L implemented an MRPM policy for its ULTRA™ line of contact lenses.

79.   In June of 2014, J&J announced MRPM policies for all of its major contact lens lines.  At the same time, J&J announced that it would discontinue contact lens lines that would not be subject to a UPP. The contact lens lines subject to an RPM policy are as follow: 1-Day ACUVUE® MOIST®, 1-DAY ACUVUE® MOIST® for ASTIGMATISM, 1-Day ACUVUE® TruEye®, ACUVUE® OASYS® with HYDRACLEAR®, ACUVUE® OASYS® for ASTIGMATISM, and ACUVUE® OASYS® for PRESBYOPIA. These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines.

80.   According to J&J, its MRPM policies will impact roughly 9.66 million consumers, or 69% of the 14 million consumers of J&J contact lenses.

81.   Laura Angelini ("Angelini"), President of J&J, announced J&J's policy in a written communication to ECPs on June 24, 2014. A trade article described the announcement as follows:

Last week, in a letter addressed to [ECPs] dated June 24, 2014, Laura Angelini, president, Johnson & Johnson Vision Care – North America, announced the company's launch of its "Enterprise Strategy" and "roadmap for the future," part of which includes resetting the price of specific contact lens products in the U.S. according to a new "unilateral pricing policy."

Now, all wholesale customers will receive the same pricing for certain existing contact lenses already offered in the company's portfolio, Angelini told VMail. The policy applies to the company's number one reusable, Acuvue Oasys, its number one disposable, Acuvue Moist, and its 1-Day Acuvue TruEye, which Angelini described as the company's "strategic brands." The new policy also sets minimum retail pricing, which has been communicated to all its customers. In addition, manufacturer's rebates have been eliminated by building those discounts into the retail price of these legacy products rather than requiring customers to send in proof of purchase to obtain rebates.

Angelini described this new pricing as a "holistic multifaceted pricing policy to refocus the conversation between the doctor and the patient on eye health and product performance rather than price. This gives the optometrist the ability to improve his or her capture rate in the office," she told VMail. "Now the patient has no incentive to shop around."

The letter to [ECPs] described the three areas in which the company would "demonstrate support for the profession and the professional—Prescribers, Portfolio and Preferred Partners."  Also in June of 2014, J&J announced that it would discontinue certain sub-brands of ACUVUE® ADVANCE®, a product line not subject to MRPM policies, on August 1, 2014, and would eliminate the other non-RPM lines on March 31, 2015. A policy letter prepared by J&J and disseminated to its customers made it clear that "[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that already is below the UPP Price, [J&J] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price."

82.     In September of 2014, CV became the last major contact lens manufacturer to implement a MRPM policy. CV implemented an RPM policy with respect to its Clariti contact lens line, which it acquired through its purchase of Sauflon, another contact lens manufacturer, for $1.2 billion in August of 2014. In January of 2014, Sauflon had instituted a UPP on the Clariti line, and CV decided to maintain the UPP after it purchased Sauflon.

83.     Under the MRPM policies, contact lens retailers are not allowed to offer discounts on these lines where the discounted price would be below the MRPM policy price. As Dr. Milicent Knight ("Knight"), head of Professional Affairs for J&J, said at the Senate Hearing, "[r]etailers maintain the right to offer store coupons, rebates or promotions (discounts) under the ACCUVUE Unilateral Pricing Policy, provided that the final net price for the product covered by the UPP remains at or above the UPP Minimum Retail Price, after discounts are applied."

84.     MRPM policies are enforced by the Manufacturer Defendants' threats to cut off supply to retailers that refuse to observe minimum price levels and through other coercive means. As Knight also explained to the United States Senate:

> Johnson & Johnson Vision Care, Inc. has three separate processes for proactive Market Price monitoring. First, there are internal resources (J&J employees) dedicated to researching, confirming and notifying sellers of UPP violations. In addition, Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices. The first of these firms monitors all on-line pricing and advertising, the second conducts in-store price validations nationwide. All customer types, regardless of size, geography, distribution method, etc. are included in one or more of these monitoring efforts. If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer.

85.     J&J expanded on its enforcement measures in a November 5, 2014 circular sent to its customers about its UPPs. That circular stated "[i]f you sell product below the UPP price, [J&J] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [J&J] will exercise its right to repurchase your current inventory of products subject to the UPP price."

86.     In a prepared statement presented at the Senate Hearing, Alcon made a similar point:

> As a result of this situation, Alcon chose to create an environment in which ECPs might more likely spend time learning about the new technology and explaining it to patients, all while having the opportunity to make a reasonable profit margin. It did so by adopting its Unilateral Pricing Policy, or UPP, when it launched DAILIES TOTAL1® in 2013. That policy provided that Alcon would not supply DAILIES TOTAL1® to customers who resold it

for less than the price announced by Alcon.

87.   B&L made a similar point in announcing its UPP:

> [E]ach customer is free to advertise or charge whatever price it wants, but should understand that Bausch + Lomb will cease to supply, and will prohibit its authorized distributors from supplying, Bausch + Lomb Ultra® contact lenses to any customer that resells or advertises Bausch + Lomb Ultra® contact lenses to the end consumer (*e.g.*, patient) for sale at less than the MRP.

88.   The Manufacturer Defendants actually carry out these threats as to the contact lens lines where the ECP or retailer sells below the UPP. In an article that appeared in the *Review of Cornea And Contact Lenses* in June of 2014, Gerber stated:

> Manufacturers employing UPP have the ability to "cut off" a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules.

89.   Similarly, Alvarez of ABB has stated publicly that the Manufacturer Defendants are very serious about policing their respective UPPs and that he knew firsthand that some ECPs had been given a "warning" for violating them. He said manufacturers are "holding the gun" and are willing to lose business in order to police their UPPs. Similarly, Murphy of Alcon confirmed that it warns violators that they are selling below the MRPM and gives them an opportunity to cure.   After a third-party auditor confirms a violation, the retailer is communicated with and "asked to make a correction" within five days.   Only if the violator refuses to increase its price does Alcon punish the violation by prospectively denying access to the product for up to one year. The clear implication of Alcon's warning system is that a retailer who has sold contact lenses below the MRPM can regain access to the product by agreeing to abide by the MRPM.

90.   Alvarez has indicated that "Unilateral Pricing Policy will bring a Fundamental Shift to the optical industry", calling them a "business-focused industry shift that many manufacturers have implemented."

1          2.          *Role of ABB and Independent ECPs in Developing and Agreeing to*

2   *MRPM Policies.*

3          91.          Independent ECPs colluded with the Manufacturer Defendants in developing the

4   MRPM agreements. Independent ECPs did this in order to increase profit margins, combat price

5   discounts from online retailers and big box stores, and eventually, eliminate competition at the

6   retail level altogether. Once that competition is eliminated, independent ECPs will be able to

7   charge whatever price they desire for contact lenses, as the UPPs are a *minimum* rather than a

8   *maximum* resale price. The Manufacturer Defendants agreed to collude with independent ECPs

9   because a prescription from an ECP is required for the Manufacturer Defendants to sell their

10  contact lens lines.

11         92.          Robert Atkinson ("Atkinson"), President of Information Technology and

12  Innovation Foundation, testified at length on the collusion with ECPs at the Senate Hearing

13  (footnotes omitted):

> But how do optometrists convey this desire to prescribe UPP lens
> to producers? . . . In the case of the eye care industry, the collusion
> may not be in a smoke-filled room, but it's collusion all the same.
> In this case, it's professional collusion through norms that is
> leading producers to adopt UPP policies.
>
> In the optometry profession these anticompetitive social norms are
> expressed in a variety of means, particularly in articles in
> professional journals and on social media channels that send a
> clear message to optometrists that they should prescribe doctors'-
> only lenses. For example, in an article in Review of Cornea and
> Contact Lens Gary Gerber, OD, writes:
>
> "One of the biggest benefits to practitioners of UPP is that it
> instantly creates a perfectly level playing field; volume discounts
> for large practices and online retailers go away. While this may
> create friction with buying groups, the benefits outweigh any
> ancillary issues. More importantly, however, it forces practices to
> focus on something other than price to keep prescriptions in their
> office—if all 'retailers' sell the lenses for the same price, the
> method and environment under which they are sold will be the
> factors that determine where a patient decides to purchase their
> lenses.
>
> He goes [on] to in essence to say, with UPP, optometrists will

prescribe the UPP lens:

"Manufacturers also benefit from UPP because retail price erosion can be stopped. With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses. For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

Finally, he states what is obvious to everyone in the industry "Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses." Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook", a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic "J&J goes to universal pricing" writes with regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next." In other words he is saying with UPPs competitors like 1-800 Contacts that sell for less will go out of business. And he is not so subtly encouraging CooperVision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to J&J adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon." In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is implying that if CooperVision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: , "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would they suddenly raise their prices to what I'm selling them."

And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd ["Giedd"], writes, "At the Ultra launch last week with 300+ ODs from around the country present

there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [*sic*] loyalty and support of this policy."

Zeidner of 1-800-Contacts gave similar testimony at the Senate Hearing.

93.     ECPs have consistently spoken out in support of the MRPM policies, touting their benefits both to ECPs and to the Manufacturer Defendants.  Some of these ECPs are actually employed by the Manufacturer Defendants.  Barry Eiden, OD ("Eiden"), for example, told an audience at the Global Contact Lens Forum that the new pricing policies represented "one of the monumental changes in contact lenses in my career." Eiden is employed as a consultant for Manufacturer Defendants Alcon, B&L and CV.  He is also an Independent ECP and the past Chair of the Contact Lens and Cornea Section of the AOA.

94.     Other Independent ECPs paid by the Manufacturer Defendants have also lent support to the new pricing policies.  For example, Giedd, who is referenced in Atkinson's testimony at the Senate Hearing, pledged her support in industry publications at the same time that she was being paid as a consultant by Alcon and CV. Similarly, David L. Kading, OD ("Kading"), who consults for Alcon, stated that the new pricing policies are "fantastic" because they set "an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization." Kading further stated that "[a]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else."

95.     ECP support for the MRPM policies is widespread and hardly limited to spokespersons paid by the Manufacturer Defendants. Other ECPs and their agents and trade associations--including  ABB,  the  AOA  and  state-level  optometric  associations--have enthusiastically endorsed and supported the Manufacturer Defendants' MRPMs, recognizing that they signal an end to retail price competition for contact lenses. A poll on Healio.com/Optometry posted after the Senate Hearing queried ECPs regarding the concept of the MRPM policies and, of 204 respondents, 85% said they supported them. Another poll, conducted by ABB, similarly found high approval by ECPs of the MRPM policies.  According to Alvarez, 82% of the hundreds of

1   doctors surveyed support them.

2       96.     The AOA has also been highly supportive of the Defendant Manufacturers' use of

3   MRPM policies. Indeed, David Cockrell, President of the AOA, testified in support of the

4   Manufacturer Defendants' actions at the Senate Hearing, and the AOA submitted written

5   comments in support of those actions. AOA and state associations of optometrists have also been

6   active in opposing legislative efforts in certain states to condemn the Defendant Manufacturers'

7   use of MRPMs.

8       97.     J&J publicly acknowledged the role that ECPs played in its formulation of a UPP.

9   Angelini said that J&J was motivated to implement its MRPM policy based on feedback received

10   from ECPs regarding price erosion. In the June 24, 2014 letter addressed to ECPs that is

11   mentioned above, Angelini explained:

> 12   When I last communicated with you about six months ago, I shared
> that Johnson & Johnson Vision Care, Inc., North America (JJVC),
> 13   was in the process of carefully assessing our overall strategy so that
> we could best meet the needs of our customers, and asked for your
> 14   feedback on what we were doing well and areas where we could
> improve. Thanks to your open and candid responses, we were able
> 15   to define our strategy and implement the changes and actions you
> told us were needed. . . . You, the [ECP] who prescribes our
> 16   products, have our unwavering support for your clinical, business,
> and patient needs. . . . To further demonstrate our commitment to
> 17   prescribers, beginning this week, many of you will begin to hear
> from your JJVC Sales Representative about our new pricing strategy
> 18   within the United States. This includes a Unilateral Pricing Policy
> (UPP) . . . . We believe the multifaceted nature of this new pricing
> 19   strategy and the variety of elements that comprise the program will
> allow you to refocus the critical doctor/patient conversation on eye
> 20   health and product performance, rather than cost. Also, by removing
> the complexity of rebates and building these savings into our new
> 21   pricing, we believe we will be able to reach more patients with
> instant savings, while providing a simpler approach for everyone.

24       98.     In a follow-up letter sent by Angelini to ECPs on or about December 17, 2014, she

25   confirmed that J&J had extended an invitation to ECPs a year previously to "share your thoughts"

26   on how J&J "could build and enhance our partnerships to help you meet the evolving needs of

27   your patients and practices. Since then, your open and candid feedback *was instrumental* in

28

helping us create Our Enterprise Strategy," which included the "new pricing strategy" of by J&J's MRPM policy. (Emphases added). Angelini welcomed continued feedback from ECPs, promising that they "can reach me and my leadership team at any time…."

99.    Robert Ferrigno, President North America for CV, made a similar point in connection with CV's adoption of a MRPM policy on one of its product lines, saying his company held twelve focus groups and met with 100 ECPs before acting.

100.    One ECP on Gerber's September 13, 2014 "Power Hour" podcast noted that Manufacturer Defendants' representatives actively counsel ECPs on how to sell contract lenses under the MRPM policies.   He stated, "you don't have to push the annual supply, because it doesn't matter – they [the parties] are going to spend the same amount of money, whether they do it in six month increments or two month increments."  As the ECP explained, "[s]o, they kind of encourage you to get one box out of each eye and go from there." J&J has also been willing to negotiate the particulars of how large customers implement its MRPM policies, as reflected in the complaint filed in the *Costco* Action.

101.    ECPs have also been instrumental in helping to police the use of UPPs. The website "ODs on Facebook", for example, gives instances of ECPs informing Alcon's sales representatives about potential violations and requesting them to take action.

102.    ABB played a principal role on behalf of ECPs to cause the Manufacturer Defendants to develop and implement the MRPMs. As early as February of 2013--before any of the Manufacturer defendants had instituted UPPs--Alvarez stated publicly that ABB's focus was to be "aligned with manufacturers."A subsequent press statement by Alvarez confirmed ABB's integral role in developing the MRPMs:

> Angel Alvarez, chief executive officer and founder of ABB Optical Group, issued a statement to PCON regarding the company's stance on UPPs.
>
> "*ABB has been working closely with manufacturers to develop [MRPMs]*, which we believe enable a better overall patient experience by supporting competitiveness of prescribing practitioners," Alvarez said. "Contact lens fitters have always been and will always be a focus of our organization. We do everything

possible to help them succeed." (Emphases added).

103.    ABB also issues publications that allow Independent ECPs (and the Manufacturer Defendants) to monitor the pricing of contact lenses in order to ensure that prices set pursuant to MRPM agreements are being followed. It publishes a quarterly *Retail Price Monitor* that facilitates this goal. ABB describes this publication as follows on its website: "[t]he ABB OPTICAL GROUP Retail Price Monitor provides [Independent ECPs] with the retail pricing structure of brand name lenses charged by private practitioners and leading online retailers. . . . The Retail Price Monitor is a benefit to ECPs looking to consolidate purchasing and maximize margins." As Alvarez stated in a press release issued in August of 2014, "[o]ur Q3 Retail Price Monitor that will be mailed with our Profit Advisor newsletter will show ECP's that they can continue to have a retail strategy by promoting annual supplies and staying within the limits of UPP."

104.    As one ECP put it, "[o]ne of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away."  This same commentator also agreed that the Manufacturer Defendants "also benefit from UPP because retail price erosion can be stopped."

105.    The 2014 third quarter issue of the ABB publication *Profit Advisor*, which was sent to Independent ECPs across the country, stated that the MRPM policies were one of the first "business-focused shifts" in the industry. It went on to advise Independent ECPs to charge more than the UPP:

> You know that competitors around the corner or the country cannot sell their contact lens for less than UPP. ECPs are staying in line, too, because the manufacturers are watching them. Sellers who choose to ignore UPP policy run the risk of being unable to purchase lenses from the manufacturer.
>
> *Remember that UPP specifies the lowest price at which a particular lens can be sold. Can you sell it for more? Indeed, yes, and I encourage you to do so.* Increase your price by several dollars--and continue using the best strategy of explaining to your patients and customers that although they may be paying a few dollars more per box, they are receiving the various benefits that you offer. See the *Soft Lens Retail Price Matrix* for a suggested

retail pricing strategy on the UPP products.

> In fact, I encourage you to adopt a policy of saying that you'll match any legitimate price on these contact lenses. You already know what the price is; it's the UPP price. It won't hurt your bottom line to match the UPP for annual supplies and for the very small percentage of customers who call on you to do so. And I expect that the vast majority of your customers will respond to your value proposition and pay your retail price. Most patients aren't looking for the absolute rock-bottom price.…

> As a result of UPP, I believe that the prescribing practitioner will be able to obtain a higher percentage of patient revenue.

106.    Alvarez repeated his advice that Independent ECPs charge their customers more than the MRPM price in a September 13, 2014 broadcast of the "Power Hour" radio hosted by Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%. Gerber concurred, saying that ECPs "should be charging more [than the MRPM] because they can."

107.    Thus, ABB and its cohorts viewed the Manufacturer Defendants' MRPM agreements as an occasion to gouge consumers even more for the price of contact lenses than would have been possible prior to the implementation of those agreements, with the hope that many consumers would not even realize they were paying a surcharge on the price mandated by UPPs that was duplicative of the service fees that they were already paying. And ABB collected data in its *Retail Price Matrix* that facilitated the ability of Independent ECPs to engage in such systematic price-gouging.

    **3.    *The Manufacturer Defendants Jointly Agreed to Implement MRPM Policies.***

108.    Collectively facing pressure from Independent ECPs and ABB about competitive threats posed by the big box stores, on-line retailers, and club stores, the Manufacturer Defendants agreed with one another and with ABB and the Independent ECPs to impose MRPM policies on their most advanced and most popular contact lenses lines.

109.    There is substantial evidence showing that the Manufacturer Defendants agreed with ABB and ECPs to enter into MRPM agreements. There is also substantial evidence showing that the Manufacturer Defendants agreed with one another to enter into MRPM agreements. That

1   evidence includes the following.

2       110.   *Industry Structure Conducive to Collusion*.   The four Manufacturer Defendants

3   control 97% of the market for contact lenses.  As noted above, the contact lens industry is a mature

4   one with high barriers to entry that involves a commoditized product.

5       111.   *Opportunities to Conspire*.  Some Manufacturer Defendants were members of the

6   Contact Lens Manufacturers' Association ("CLMA") and were the *only* members of the Contact

7   Lens Institute ("CLI"), the activities of which are described below.  As members of this

8   Association, the Manufacturer Defendants had regular opportunities to meet, exchange

9   information, and signal intentions to one another.  The CLMA hosts an annual meeting, publishes

10  bi-weekly presidential updates to its members, and regularly publishes a newsletter.

11      112.   *Information Exchanges*. The exchange among competitors of competitively

12  sensitive, non-public information can be indicative of a price-fixing conspiracy and this conduct

13  itself can violate the antitrust laws. Such exchanges occurred in the context of the CLI. According

14  to the CLI's website, it was created to "represent[] the interests of its members . . . ."  CLI has no

15  members other than the Manufacturer Defendants. Its board of directors consists of one executive

16  from each of the Manufacturer Defendants.  CLI's Chair is Angelini of J&J. Its Vice-Chair is

17  Andrew Sedgwick, Vice-President of Global Commercial Strategy & Business Development for

18  CV. Its Treasurer is Richard Weisbarth, Vice-President of Professional Affairs for Alcon. Its

19  Director is Joseph Barr, Vice-President of Clinical and Medical Affairs for B&L.

20  Contemporaneously with the Manufacturer Defendants' adoption of UPPs, the CLI "newly

21  created" a committee "to develop a collaborative approach by the member companies to help

22  inspire ECPs and their staff to proactively pursue opportunities to fit CLs [contact lenses] and

23  appropriately follow up so that their patients and practice will benefit."  The CLI's website further

24  notes that "[t]he members of the CLI, together with other participating companies participate in a

25  quarterly statistical program to track manufacturer shipment data of Contact Lens and Lens Care

26  products which is managed by Veris Consulting ['Veris'].  The program's objective is to provide

27  participants with accurate and timely consolidated market data. . . . . Each participating company

28

in the CLI Statistical Program has a representative on the CLI Global Statistical Task Force." According to Veris' website, the program established by it for the CLI "track[s] sales at a detailed level worldwide" and "is more valuable than other sources of market data because sales are reported directly from manufacturers". Veris states that its work for the CLI "is the only program where the data is reviewed annually by Veris to ensure accuracy. Veris implemented this internal review process to reassure participants that they could be confident in the data." Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level." The resulting low margin of error "is extremely important to participants since they use this data for strategic planning" and is reported to the Manufacturer Defendants on a quarterly and annual basis. According to its website, Karen Eftekari, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards." The CLI functions as one of the vehicles through which the Manufacturer Defendants collude to enforce and monitor their respective MRPMs. The CLI price monitoring program allows the Manufacturer Defendants to keep their fellow manufacturing in line and prevents cheating among the group.

113. *ABB's and Independent ECPs' Conduct.* The Manufacturer Defendants' close relationships with ECPs and with a principal ECP representative, Defendant ABB, enabled the Manufacturer Defendants to collaborate with the ECPs and ultimately with each other to develop the MRPM policies. As noted above, ABB has stated publicly that it "work[ed] closely with manufacturers to develop unilateral pricing policies." Similarly, the Manufacturer Defendants have stated that they collaborated with ECPs to develop the policies. J&J, for example, in its letter to ECPs announcing its MRPM policy, stated that it developed the policy in response to ECP "feedback", that ECPs were "instrumental" in formulating J&J's policy, and that J&J's implementation of that policy "further demonstrates our commitment to [ECPs]." As also noted above, CV has admitted that it decided to use a UPP on its Clariti line of contact lenses in direct

1  response to feedback from Independent ECPs. During this collaborative process, on information

2  and belief, ABB and the ECPs communicated to each Manufacturer Defendant its competitors'

3  position on MRPM policies.

4        114.   *Acts Contrary to Economic Self-Interest*. The acts of the Manufacturer Defendants

5  in adopting MPRM policies were contrary to each one's independent economic self-interest. In a

6  candid analyst presentation made on September 11, 2014, CV admitted the "Potential

7  Downsides/Challenges" of adopting MRPM policies included: (a) "Enforcement can be

8  challenging"; (b) "Consumer activism may generate legislative backlash and negative public

9  perceptions"; and (c) "May alienate larger customers who want greater pricing freedom and cross

10 marketing." Yet only days later, it adopted an MPRM agreement on its new flagship Clariti line of

11 contact lenses. The other Manufacturer Defendants faced similar adverse impacts, as reflected in

12 the events of 2014 and early 2015, which included complaints to the FTC, the Senate Hearing, a

13 publicly-revealed investigation by the New York AG into Alcon's adoption of MRPM policies,

14 negative consumer backlash and proposed legislation in various state legislatures. Despite these

15 reasons not to implement MRPM policies, all four Manufacturer Defendants proceeded to do so.

16 Another consequence in 2014 of doing so was slower sales growth, which was certainly contrary

17 to their individual economic self-interests. One industry analyst has noted that United States

18 contact lens sales growth only increased sluggishly by 2% through the third quarter of 2014, a

19 development that it attributed to the implementation of MRPM policies.  Further demonstrating

20 that the Manufacturer Defendants implemented MRPM policies contrary to their individual

21 economic self-interest, Dean Butler, the founder of LensCrafter, has stated that consumers

22 purchase more eye care products--including contact lenses--when shopping online  Similarly, as

23 noted above, ABB's Alvarez has said publicly that the Manufacturer Defendants are willing to

24 lose business in order to enforce their MRPM policies, something that is not in their independent

25 economic self-interest. The Manufacturer Defendants have tried to justify their conduct by

26 claiming that consumers could be injured by buying contact lenses from shoddy retailers who

27 provide low-quality service. That purported justification is pretextual--a fact that also supports an

28

inference of conspiratorial conduct. As a February 18, 2015 article in the *Salt Lake Tribune* noted, when the Chairman of the Utah Senate Business & Labor Committee questioned an industry lobbyist on this purported justification at a legislative hearing held on February 17, the latter "could not provide an example of that ever occurring." Indeed, Carol Alexander ("Alexander"), a Director of Professional Affairs at J&J, stated during this hearing that she could not identify a single instance where a patient was harmed or placed at risk because he or she was able to buy contact lenses from a source other than optometrists. Alexander *admitted* that the adoption of MRPM policy by J&J was *not* motivated by concerns about patient risk or harm. Similarly, Costco has explained that J&J "asserts this change [adoption of an MRPM policy] is for the benefit of patients—we totally disagree." The allegations of the complaint filed in the *Costco* Action further support this assertion. It was thus contrary to the economic self-interest of any one of the Manufacturer Defendants to attempt to implement an MRPM policy without assurance that its competitors would follow suit. The discounters referred to above collectively possessed sufficient buying power in the contact lens market that no Manufacturer Defendant would be willing to forego those sales or alienate those customers by acting alone. If only some of the Manufacturer Defendants had adopted MRPM policies, discounters such as Costco or Wal-Mart could have shifted market share to those manufacturers that did not dictate a minimum retail price. In fact, after all of the Manufacturer Defendants except for CV had implemented MRPM policies, Costco sent a letter to its customers informing them of the other Manufacturer Defendants' MRPM policies and urging them to switch to CV, only to see CV soon thereafter implement an MPRM policy on its flagship Clariti line.

115. *Motive to Conspire, Including Assurances That Competitors Will Also Act*. Each of the Manufacturer Defendants had a motive to maintain high retail prices for its contact lenses. They were concerned that low retail prices would put pressure on them to lower wholesale prices. In addition, in order to encourage Independent ECPs to prescribe their contact lenses, the Manufacturer Defendants needed to keep the retail prices high. ABB, which (a) is the largest distributor of contact lenses in the United States, (b) sells the Manufacturer Defendants' contact

1   lenses to two-thirds of ECPs, and (c) has stated publicly that it "worked with" the Manufacturer
2   Defendants to develop and implement the MRPMs, was in a position to act as the "hub" in a "hub-
3   and-spoke" conspiracy. That is, ABB was in a position to communicate to each Manufacturer
4   Defendant before it implemented an MRPM that its competitors also intended to do so.

5       116.    *Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing Policies*. Before
6   June of 2013, none of the Manufacturer Defendants restricted the minimum retail price of its
7   contact lenses. After Alcon imposed the first MRPM policy in June of 2013, all of its competitors
8   followed suit within 15 months. As Alvarez of ABB, put it, the MRPM policies represent a
9   "Fundamental Shift" in the contact lens market. As noted above, contact lenses are the *only*
10  prescription medical device sold in the United States pursuant to an MRPM policy.

11      117.    *Past Conspiratorial Conduct*. The Manufacturer Defendants and Independent ECPs
12  have also demonstrated a past propensity to conspire against discounting retailers of contact
13  lenses, as reflected in the discussion above of the First Contact Lens Litigation.

14          **4.      *The Manufacturer Defendants' MRPM Policies Harm Competition.***

15      118.    Defendants' agreement to implement MRPM policies has harmed and continues to
16  harm competition by increasing prices for the contact lenses made subject to them. Consumers
17  ultimately pay the economic cost of this wrongful conduct in the form of higher prices for contact
18  lenses affected by UPPs.

19      119.    At the Senate Hearing, Zeidner presented the following graphic showing a range of
20  a 40% to 112% difference between the lowest internet price for J&J's affected products and its
21  UPP price.

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11



12    120.    George Slover, Senior Policy Counsel for the Consumers' Union, and Atkinson
13  gave similar testimony at the Senate Hearing.

14    121.    Zeidner noted that as of July of 2014, MRPM policies encompassed 40% of the
15  market and predicted 80% coverage by the end of 2015, especially with ECPs writing
16  prescriptions for contact lenses subject to the policy. As noted above, since his testimony at the
17  Senate Hearing, CV adopted an MRPM policy on one of its contact lens lines.

18    122.    Similar testimony was given by Jay Magure ("Magure"), the Vice-President of
19  Governmental Affairs for 1-800-Contacts, at the aforementioned February 17, 2015 hearing before
20  the Utah Senate Business & Labor Committee. He noted that because of J&J's adoption of UPPs,
21  1-800-Contacts was compelled to eliminate rebates of between $15 and $100 on numerous J&J
22  ACUVUE® products. The result was that it effectively was forced to raise prices on the vast
23  majority of the contact lenses it sells that are subject to UPPs. In a January 24, 2015 article,
24  Oregonlive.com corroborated this point with a real-world example, noting how 1-800-Contacts
25  sold a 90-lens box of J&J ACUVUE® MOIST® contact lenses a year ago at a price as low as
26  $57.49, but the same product is now sold by it for a low of $63.74. In his aforementioned
27  testimony, Magure noted that a survey of 780 doctors conducted by 1-800-Contacts both before

28

and after J&J's implementation of UPPs confirmed that prices for J&J contact lenses subject to such UPPs increased by 57% when compared to pre-UPP levels.

123. Similarly, the website <stoppupp.org> has published this comparison of J&J's December 2013 contact lens prices (accounting for rebates and mail-in coupons) and its post-UPP prices:

| J&J Product | Old Price | UPP Price | % Change |
|---|---|---|---|
| 1-Day ACUVUE® MOIST® (30 Lenses) | $13.80 | $33.00 | +139% |
| 1-Day ACUVUE® MOIST® (90 Lenses) | $36.49 | $63.50 | +74% |
| 1-DAY ACUVUE® MOIST® for ASTIGMATISM (30 Lenses) | $18.24 | $34.50 | +89% |
| 1-Day ACUVUE® TruEye® (90 Lenses) | $47.74 | $82.50 | +73% |
| ACUVUE® OASYS® with Hydraclear Plus (12 Lenses) | $22.68 | $67.50 | +198% |
| ACUVUE® OASYS® with Hydraclear Plus (24 Lenses) | $44.23 | $110.00 | +149% |
| ACUVUE® OASYS® for ASTIGMATISM (6 Lenses) | $21.74 | $40.00 | +84% |
| ACUVUE® OASYS® for PRESBYOPIA | $22.96 | $40.00 | +74% |

124. The effect of UPPs is reflected on the websites of internet retailers of contact lenses. In response to the questions about why it no longer beats the prices of others for contact lenses by 2% and why it charges the same as doctors, 1-800-Contacts' website states:

> We have always stood behind our commitment to beat any price by 2%. While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit. We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected

by UPP. . . . The [UPP] created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses.

125.    Similarly, the website of LensDiscounters.com has this to say about MRPM policies:

UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer. . . . Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs. their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere. Initially, this might seem like a fair practice, but it prevents free market pricing -- and in the end, results in higher pricing to you, the end consumer. . . . .At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers. We will do what we can to fight these pricing policies and keep eyecare affordable for our customers. We will continue to keep you informed and will have more information about UPP soon.

126.    Meijer's website contains the following statements:

The manufacturers state that they have instituted the UPP for their customers however, the adoption of the UPP essentially prevents marketplace competition. This eliminates your ability to shop around for the best price on these contact lens brands, as well as our ability to offer relief. . . . The manufacturers have created a "floor" or a "minimum' price that the lenses may not be priced below. Our prices had been lower than that "minimum" prior to this change in policy. The UPP has caused us to raise our prices on these contact lens brands in order to remain in compliance with this policy.

127.    Likewise, 1-800-GET-LENS told its customers that "Bausch & Lomb has implemented a Unilateral Pricing Policy (UPP) on all retailers, both online and bricks and mortar. The UPP prevents anyone from selling Bausch & Lomb products below a certain price." A representative for Costco testified before the Washington Senate Health Care Committee on February 16, 2015 that the Manufacturer Defendants' implementation of MPRM policies has

1  caused it to raise prices on affected contact lenses by as much as 35%.

2      128.    In mid-2014, Costco conducted an analysis of its prices for Alcon's DAILIES

3  TOTAL1 contact lenses before and after Alcon implemented MRPM.  It concluded that the price

4  for a 90-lens pack increased from $85.00 to $95.00.  It also examined J&J prices, and concluded

5  that J&J's MPRM policy required Costco to raise its prices an average of 26%. Costco makes

6  similar allegations in the *Costco* Action.

7      129.    Gerber, in his article quoted above, also confirms that UPPs have the effect of

8  elevating contact lens prices.  Indeed, at a January 29, 2015 hearing before the Mississippi Senate

9  Public Health & Welfare Committee, 1-800-Contacts presented econometric evidence that the use

10  of MRPM policies going forward could cost contact lens consumers as much as $2 billion

11  annually.  Defendants' conspiracy has thus caused Plaintiffs and members of the Class to pay

12  supracompetitive prices for contact lenses and has substantially eliminated price competition in the

13  market.

14      ***5.    There is No Justification for the Manufacturer Defendants' MRPM***

15  ***Policies.***

16      130.    Plaintiffs acknowledge that under the United States Supreme Court's precedent in

17  *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ("*Leegin*"), federal

18  antitrust claims alleging the unlawfulness of vertical MRPM policies are examined under the Rule

19  of Reason.

20      131.    However, in this case, Plaintiffs do not allege merely that the Manufacturer

21  Defendants entered into vertical MRPM policies with their retailers.  Instead, Plaintiffs allege that

22  the Manufacturer Defendants, in addition to conspiring with the ECPs and ABB, also conspired

23  with each other in a horizontal, *per se* illegal agreement in restraint of trade. They also allege that

24  these policies were the subject of agreements among the Defendant Manufacturers and

25  Independent ECPs, effectuated through

26      132.    Moreover, even to the extent Plaintiffs' claims challenging each Manufacturer

27  Defendant's MRPM policy are examined separate and apart from the agreement among the

28

1   Manufacturer Defendants, the Court in *Leegin* did not immunize vertical RPM from federal

2   antitrust scrutiny. Rather, the Court identified three factors to be used in determining whether an

3   RPM program is unreasonable: (a) whether several competing manufacturers adopt RPM

4   programs; (b) whether retailers play a role in instigating RPM programs; and (c) whether

5   manufacturers or retailers have market power. *Id*. at 897-98. The Court made it clear that "the

6   potential anticompetitive consequences of vertical price restraints must not be ignored or

7   underestimated." *Id*. at 894.

8        133.    The first and third *Leegin* factors are satisfied here. Alcon, J&J, CV, and B&L have

9   all adopted MRPM policies. Collectively, the Manufacturer Defendants control 97% of the

10  domestic contact lens market (by revenue). Independent ECPs also prescribe the majority of

11  contact lenses sold in the United States. Under *Leegin*, these facts alone are sufficient to justify

12  stricter scrutiny.

13       134.    The second factor is also satisfied. Independent ECPs and ABB played a significant

14  role in instigating manufacturers to adopt MRPM policies. ABB worked with all four

15  Manufacturer Defendants to impose the MRPM policies. As the dominant distributor in the

16  market, ABB has the power to foreclose price competition. In addition, J&J stated that it

17  developed its MRPM policy after listening to ECPs' "feedback" and they were "instrumental" in

18  the creation of that policy. CV has also admitted as much. This is consistent with Independent

19  ECPs' other conduct aimed at keeping out low-cost competitors, including their campaign in the

20  1980s and 1990s to boycott mail-order contact lens suppliers, their public opposition to sales of

21  contact lenses by non-traditional retailers (such as Costco), and their resistance to giving patients

22  their prescriptions, as required by federal law.

23       135.    Nor do the MRPM agreements have any procompetitive justification. These

24  policies do not prevent free-riding because the ECP is compensated for his or her services (the eye

25  examination), even if the patient fills the prescription elsewhere. As noted above, concerns about

26  harm to patients from buying contact lenses from other than ECPs are pretextual and do not justify

27  the anticompetitive conduct claimed here. Furthermore, the Manufacturer Defendants' MRPM

28

1  policies do not encourage ECPs to focus more on patient needs instead of contact lens costs.

2  Instead, they do just the opposite; as several ECPs have said, a "savvy" ECP will always prescribe

3  a contact lens subject to a MRPM agreement over another one, because the ECP will earn a greater

4  profit.

5  **VIII.**  **CAUSES OF ACTION.**

6  **First Cause of Action.**

7  **CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1.**

8  136.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

9  herein.

10  137.    Beginning in June of 2013 and continuing to the present, Defendants have engaged

11  in a conspiracy and agreement in unreasonable restraint of trade in violation of Section 1 of the

12  Sherman Act (15 U.S.C. § 1). The Manufacturer Defendants implemented MRPM policies in

13  concert with each other and with Independent ECPs, acting, in part, through Defendant ABB,

14  which is complicit in their implementation. Non-ECP vendors of contact lenses are coerced into

15  abiding by the UPPs or suffer the loss of the ability to sell the products covered by them. The

16  Manufacturer Defendants agreed, at least tacitly, among themselves to start using MRPM policies,

17  recognizing that the policies could be enforced only if all of them implemented UPPs. The

18  Manufacturer Defendants also conspired with Defendant ABB and with Independent ECPs to

19  implement UPPs. As noted above, UPPs represented a drastic change in how contact lenses were

20  sold in the United States.

21  138.    Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the

22  Sherman Act, no allegations with respect to the relevant product market, geographic market, or

23  market power are required.   To the extent such allegations may otherwise be necessary, the

24  relevant market for purposes of this action is disposable contact lenses.   The relevant geographic

25  market is the United States.  The Manufacturer Defendants possess market power in the market for

26  disposable contact lenses.  Collectively, they control roughly 97% of that market.

27  139.    As a result of Defendants' unlawful conduct, prices for contact lenses subject to

28

1  UPPs were raised, fixed, maintained and stabilized in the United States.

2  140.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of

3  the Class have been injured in their businesses and property in that they have paid more for

4  contact lenses than they otherwise would have paid in the absence of that conduct.

5  141.    With respect to their claim under the Sherman Act, Plaintiffs seek injunctive relief,

6  treble damages and attorneys' fees and costs.

7  **Second Cause of Action.**

8  **CLAIM FOR VIOLATIONS OF THE CALIFORNIA CARTWRIGHT ACT.**

9  142.    The California Plaintiffs incorporate by reference all the above allegations as if

10  fully set forth herein.

11  143.    Defendants' conduct has occurred in substantial part in the State of California and

12  is also violative of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq*.), which prohibits

13  combinations of two or more persons' capital, skill, or acts to restrict trade or commerce. Unlike

14  the vertical RPM schemes under federal antitrust law, such schemes are viewed as *per se*

15  violations of the Cartwright Act. *Mailand v. Burckle*, 20 Cal. 3d 367 (1978).

16  144.    The California Plaintiffs and the other members of the California subclass paid

17  supra-competitive, artificially inflated prices for contact lenses.

18  145.    As a direct and proximate result of Defendants' unlawful conduct, the California

19  Plaintiffs and the members of the California subclass have been injured in their business and

20  property in that they paid more for contact lenses than they otherwise would have paid in the

21  absence of that conduct.

22  146.    The MRPM policies instituted by the Manufacturer Defendants and the conduct of

23  all Defendants in implementing them violate the Cartwright Act and should be enjoined

24  accordingly.

25  147.    As a result of Defendants' violation of the Cartwright Act, the California Plaintiffs

26  and the members of the California subclass seek treble damages and the costs of suit, including

27  reasonable attorneys' fees. *See* Cal. Bus. & Prof. Code § 16750(a).

28

1

**Third Cause of Action.**

2

**CLAIM FOR VIOLATIONS OF MARYLAND ANTITRUST ACT.**

3       148.    The Maryland Plaintiff incorporates by reference all the above allegations as if

4    fully set forth herein.

5       149.    Defendants' conduct has occurred in substantial part in the State of Maryland.

6       150.    In 2009, the legislature of the State of Maryland overturned the decision in *Leegin*

7    by amending the Maryland Antitrust Act ("MAA") (Maryland Comm. Code §§ 11-204 *et seq*.).

8    The newly-enacted language stated that "a contract, combination, or conspiracy that establishes a

9    minimum price below which a retailer, wholesaler, or distributor may not sell a commodity or

10   service is an unreasonable restraint of trade or commerce." *Id*., § 11-204(b). The MRPM policies

11   instituted by the Manufacturer Defendants and the conduct of all Defendants in implementing

12   them effectively establish such a minimum price and are presumptively unlawful under Maryland

13   law.

14      151.    The Maryland Plaintiff and the members of the Maryland subclass have been

15   injured by the implementation of Defendants' MRPM policies and seek all remedies available to

16   them under the MAA, including treble damages and attorneys' fees and costs. *See* Maryland

17   Comm. Code § 11-209(b).

18

**Fourth Cause of Action.**

19

**CLAIM FOR VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW.**

20      152.    The California Plaintiffs incorporate by reference all of the above allegations as are

21   fully set forth herein.

22      153.    Defendants' conduct has occurred in substantial part in the State of California The

23   California. California's Unfair Competition Law ("UCL") (Cal. Bus. and Prof. Code §§ 17200 *et*

24   *seq*.) prohibits acts of unfair competition, which mean and include any "unfair . . . business

25   practices."

26      154.    Defendants' conduct constitutes "unfair" business acts and practices because

27   Defendants' practices have caused and are "likely to cause substantial injury" to the California

28

Plaintiffs and the members of the California subclass that is not "reasonably avoidable" by the California Plaintiffs and the members of the California subclass and is "not outweighed" by the practices' benefits to the California Plaintiffs and the members of the California subclass.

155. As more fully described above, the purpose and effect of Defendants' agreements to impose MRPM policies on leading contact lens lines was and is to eliminate the competition engendered by the FCLCA. Defendants' anticompetitive agreements constitute unfair business acts or practices within the meaning of the UCL in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to the general public.

156. The California Plaintiffs and the members of the California subclass have been and are unable to avoid injury, because ECPs, co-conspirators and beneficiaries of the MRPM agreements, are the ones who prescribe the contact lenses that the California Plaintiffs and members of the California subclass are required to use, without substitution.

157. Defendants' MRPM policies are contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

158. Independently of prohibiting acts of "unfair" competition, the UCL also prohibits "unlawful" business acts or practices. The conduct alleged in this Complaint not only violates the Sherman Act and the antitrust laws of California and Maryland, but also is in direct contravention of the policy and spirit of the FCLCA and the FTC's Contact Lens Rule. This unlawful conduct has significantly harmed Plaintiffs and the Class.

159. The California Plaintiffs and the members of the California subclass have suffered injury in fact and have lost money as a result of Defendants' unfair competition and violations of law in that they paid more for contact lens that they would have paid in the absence of the MRPM agreements. They are therefore entitled to the relief available under the UCL as detailed herein.

**Fifth Cause of Action.**

**VIOLATION OF MARYLAND CONSUMER PROTECTION ACT .**

160. The Maryland Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

161.     The Maryland Consumer Protection Act ("MCPA") was enacted to set certain minimum statewide standards for the protection of consumers across the State.  Under the MCPA, a person may not engage in any unfair trade practice concerning the sale of any consumer good or service.  Md. Com. Law §13-303(1).

162.     Under the MCPA, a trade practice is considered unfair when it results in a: (1) substantial injury; (2) that is not outweighed by any countervailing benefits to the consumer or to competition that the practice produces; and (3) it must not be the type of injury that a consumer could reasonably have avoided.

163.     The Defendants have violated this prohibition by engaging in unfair practices concerning the implementation of MRPM policies, which have directly and proximately caused the Maryland Plaintiff and the members of the Maryland subclass to incur substantial additional actual damages in the form of increased prices paid for contact lenses at retail.

164.     The Defendants' conduct also violates the purpose and intent of the FCLCA, which was enacted by Congress to foster price competition in the retail sale of contact lenses in light of previous anticompetitive conduct of the Defendants and ECPs. The FCLCA was specifically enacted to "increase competition in the sale of contact lenses which will bring a substantial savings to America's contact lens wearers."

165.     The Defendants' implementation of MRPM agreements presents insurmountable obstacles to the Maryland Plaintiff's and the Maryland subclass members' ability to obtain the lowest price for contact lenses, and thereby interferes with a well-functioning market for the sale of contact lenses.

166.     The Maryland Plaintiff and the members of the Maryland subclass have been and continue to be substantially injured as a result of the Defendants' conduct.

167.     The Defendants' conduct is not outweighed by any countervailing benefits to Maryland consumers or to competition.  Specifically, the assertion by the Defendants that their MRPM policies are designed to eliminate free rider problems created by mass merchandisers and online retail sellers of contact lenses is not a legitimate, pro-competitive reason for the

1   introduction of MRPM policies.  Independent ECPs are doctors who have a duty to educate

2   themselves on matters that affect the rendering of professional advice to their patients.  The ECPs

3   are compensated for their services through the payment of professional fees by their patients.  As

4   Independent ECPs have themselves have acknowledged, MRPM policies are a mechanism to

5   simply increase their profits at the expense of their patients, and do not serve to enhance the

6   medical benefits they receive.  Independent ECPs have even acknowledged that MRPM policies

7   affect their medical judgment to the detriment of consumers, in that ECPs will prescribe contact

8   lenses subject to MRPM policies in order to increase their medical offices' profitability and to

9   avoid retail price competition with mass merchandisers and the online channel.

10  **IX.    PRAYER FOR RELIEF.**

11          WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf and on behalf of

12  the Class herein, adjudging and decreeing that:

13          A.      This action may proceed as a class action, with Plaintiffs as the designated Class

14  representatives (and where appropriate, subclass representatives) and their counsel as Class and

15  subclass Counsel;

16          B.      Defendants have engaged in a contract, combination, and conspiracy in violation of

17  Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the UCL, the MCPA,

18  and the MAA and that Plaintiffs and the members of the Class (or where appropriate, subclasses)

19  have been injured in their business and property as a result of Defendants' violations;

20          C.      Plaintiffs and the members of the Class (or, where appropriate, subclasses) recover

21  damages sustained by them, as provided by the federal antitrust laws, the California Cartwright

22  Act, the UCL. the MCPA, and the MAA and that a judgment in favor of Plaintiffs and the Class be

23  entered against the Defendants in an amount to be trebled to the extent such trebling is permitted

24  pursuant to such laws;

25          D.      Plaintiffs and the members of the Class (or, where appropriate, subclasses) recover

26  restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

27          E.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

28

1 respective officers, directors, partners, agents, and employees thereof and all other persons acting

2 or claiming to act on their behalf be permanently enjoined and restrained from continuing and

3 maintaining the combination, conspiracy, or agreement alleged herein;

4       F.      Plaintiffs and members of the Class (or, where appropriate, subclasses) be awarded

5 pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal

6 rate from and after the date of service of the initial complaint in this action;

7       G.      Plaintiffs and members of the Class (or, where appropriate, subclasses) recover

8 their costs of this suit, including reasonable attorneys' fees as provided by law; and

9       H.      Plaintiffs and members of the Class (or, where appropriate, subclasses) receive

10 such other or further relief as may be just and proper.

11 **X.      JURY TRIAL DEMAND.**

12       Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

13 of the claims asserted in this Complaint so triable.

14

15 DATED:  March 3, 2015          By:  _____ */s/ Michael P. Lehmann* _____

MICHAEL P. LEHMANN (State Bar No. 77152)
16 BONNY E. SWEENEY (State Bar No. 176174)
CHRISTOPHER L. LEBSOCK (State Bar No. 184546)
17 HAUSFELD LLP
44 Montgomery Street, Suite 3400
18 San Francisco, CA 94104
Telephone: 415-633-1908
19 Facsimile:  415-217-6813
mlehmann@hausfeldllp.com
20 bsweeney@hausfeldllp.com
clebsock@hausfeldllp.com

21 MICHAEL D. HAUSFELD (*pro hac vice* to be filed)
JAMES J. PIZZIRUSSO (*pro hac vice* to be filed)
22 NATHANIEL C. GIDDINGS (*pro hac vice* to be filed)
HAUSFELD LLP
23 1700 K St. NW
Suite 650
24 Washington, DC 20006
Telephone: 202-540-7200
25 Facsimile:  202-540-7201
mhausfeld@hausfeldllp.com
26 jpizzirusso@hausfeldllp.com
ngiddings@hausfeldllp.com

27

28

1    HULETT HARPER STEWART LLP
     DENNIS STEWART (State Bar No. 99152)
2    225 Broadway, Suite 1350
     San Diego, CA  92101
3    Telephone:  619-338-1133
     Facsimile:   619-338-1139
4    dennis@hulettharper.com

5    JEFFREY D. KALIEL (State Bar No. 238293)
6    TYCO & ZAVAREEI LLP
     200 L St. NW
7    Suite 808
     Washington DC 20036
8    Telephone: 202-973-0900
     Facsimile: 202-973-0950
9    jkaliel@tzlegal.com

10   JEFFREY M. OSTROW (*pro hac vice* to be filed)
11   SCOTT A. EDELSBERG (*pro hac vice* to be filed)
     KOPELOWITZ OSTROW, P.A.
12   200 S.W. 1st Avenue, 12th Floor
     Fort Lauderdale, FL 33301
13   Telephone: 954-525-4100
     Facsimile: 954-525-4300
14   ostrow@kolawyers.com
     edelsberg@kolawyers.com
15

16   TIMOTHY G. BLOOD (State Bar No. 149343)
     PAULA M. ROACH (State Bar No. 254142)
17   BLOOD HURST & O'REARDON, LLP
     701 B Street, Suite 1700
18   San Diego, CA  92101
     Telephone: 619-338-1100
19   Facsimile: 619-338-1101
     tblood@bholaw.com
20   proach@bholaw.com

21

22   *Counsel for Plaintiffs*

23

24

25

26

27

28